**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

SHOPSEE, INC.,

Plaintiff,

vs.

TIKTOK INC.,

Defendant.

Case No. 3:26-cv-00703-AMO

**DECLARATION OF DR. BENJAMIN B. BEDERSON REGARDING PATENT ELIGIBILITY OF U.S. PATENT NO. 11,134,316 UNDER 35 U.S.C. § 101**

I, Benjamin B. Bederson, declare as follows:

1. I have personal knowledge of the statements in this Declaration, and if called upon as a witness, I could and would testify competently to them.

2. I have been retained as a technical expert for Plaintiff ShopSee, Inc. ("ShopSee") in connection with the above-captioned case filed against Defendant TikTok Inc. ("TikTok") concerning U.S. Patent No. 11,134,316 (the "'316 patent"). I was asked by counsel for ShopSee to provide this Declaration, which sets forth my opinions regarding the eligibility of the '316 patent under 35 U.S.C. § 101.

3. I am being compensated for my time spent working in connection with this Declaration at my standard hourly rate of $750. My compensation does not depend on the substance of my opinions or testimony.

4. Unless otherwise indicated, I have personal knowledge of the matters set forth below. If called as a witness, I could and would testify competently as follows.

5. I am more than eighteen years of age and a citizen of the United States. I currently reside in Maryland State.

6. My opinions expressed herein are based on review and analysis of certain information obtained in connection with my work on this case, together with my background, training, education, and experience. The opinions expressed herein are my own. I reserve the

right to amend and/or supplement this Declaration, as appropriate.

## I. BACKGROUND AND QUALIFICATIONS

7. I received a B.S. degree in Computer Science with a minor in Electrical Engineering in 1986 from the Rensselaer Polytechnic Institute. I received M.S. and Ph.D. degrees in Computer Science in 1989 and 1992, both from New York University.

8. I am currently Professor Emeritus of Computer Science at the University of Maryland ("UMD"). From 2014 to 2018, I was the Associate Provost of Learning Initiatives and Executive Director of the Teaching and Learning Transformation Center at the UMD. I am a member and previous director of the Human-Computer Interaction Lab ("HCIL"), the oldest and one of the best known Human-Computer Interaction ("HCI") research groups in the country. I was also co-founder and Chief Scientist of Zumobi, Inc. from 2006 to 2014, a Seattle-based startup that is a publisher of content applications and advertising platforms for smartphones. I am also cofounder and co-director of the International Children's Digital Library ("ICDL"), a website launched in 2002 that provides the world's largest collection of freely available online children's books from around the world at www.childrenslibrary.org with an interface aimed to make it easy for children and adults to search and read children's books online. I was also co-founder and prior Chief Technology Officer of Hazel Analytics, a data analytics company to improve food safety and better public health whose product sends alerts in warranted circumstances. In addition, over the past 15 years, I have consulted for many companies in the area of user interfaces, including EPAM, Hillcrest Labs, Lockheed Martin, Logitech, Microsoft, NASA Goddard Space Flight Center, the Palo Alto Research Center, and Sony.

9. For more than 30 years, I studied, designed, and worked in the field of computer science and HCI. My experience includes 30 years of teaching and research, with research interests in HCI and the software and technology underlying today's interactive computing systems. This includes the design and implementation of hardware and software systems, including the use of audio and video processing, and graphical user interfaces with layers on a range of devices, including embedded systems, controllers, smart phones, and PDAs.

10. I have designed, programmed, and publicly deployed dozens of user-facing

software products that have cumulatively had millions of users. My work is cited by several major companies, including Amazon, Apple, Facebook, Google, and Microsoft. I am a named inventor on 14 U.S. patents and 20 U.S. patent applications.

11. My qualifications related to the matters in this Declaration are summarized here and include my educational background, research experience, professional experience, and other relevant qualifications. A true and correct copy of my *curriculum vitae*, which contains further information pertaining to my qualifications is attached as **Exhibit A**.

## II. MATERIALS AND INFORMATION CONSIDERED

12. To form my opinions, I have reviewed the ’316 patent, relevant portions of the ’316 patent’s prosecution history, as well as the documents and information cited in this Declaration. Throughout this Declaration, I cite to portions of documents, including Exhibits B-G, which are attached to my Declaration:

- Attached hereto as **Exhibit B** is a true and correct copy of an excerpt from Ben Shneiderman & Catherine Plaisant, DESIGNING THE USER INTERFACE (4th ed., 2005) (“Shneiderman”). Due to the digitization of this copy, there are some changes in the imaged font, but these do not impact my opinions or my reliance on certain portions of Exhibit B.
- Attached hereto as **Exhibit C** is a true and correct copy of Renee Garett et al., *A Literature Review: Website Design and User Engagement*, 6 ONLINE J. OF COMM’N AND MEDIA TECHS. 1 (2016) (“Garett”).
- Attached hereto as **Exhibit D** is a true and correct copy of an excerpt from Wilbert O. Galitz, THE ESSENTIAL GUIDE TO USER INTERFACE DESIGN (2d ed., 2002) (“Galitz”).
- Attached hereto as **Exhibit E** is a true and correct copy of Ruth Rosenholtz et al., *Measuring Visual Clutter*, 7 J. OF VISION 1 (2007) (“Rosenholtz”).
- Attached hereto as **Exhibit F** is a true and correct copy of Wei Zha & H. Denis Wu, The Impact of Online Disruptive Ads of Users’ Comprehension, Evaluation of Site Credibility, and Sentiment of Intrusiveness, 16 AM. COMM’N. J. 15 (2014) (“Zha”).
- Attached hereto as **Exhibit G** is a true and correct copy of Patrick Baudisch & Ruth

Rosenholtz, *Halo: A Technique for Visualizing Off-Screen Locations*, in ACM Conference on Human Factors in Computing Systems (CHI), 481 (2003) ("Baudisch").

Citations to these documents are intended as examples, and I reserve the right to rely on other portions of these same documents.

13. I have also relied on my professional judgment and expertise, gathered from many years of work in the field of computer science, including in graphic user interfaces systems and data visualization.

14. I have reviewed TikTok's Motion for Judgment On The Pleadings Under 35 U.S.C. § 101 ("Tik Tok's Motion"), and the materials cited in TikTok's Motion.

## III. LEGAL PRINCIPLES

15. I am not an attorney and do not offer any opinions on the law. Counsel for ShopSee has instructed me as to the applicable legal standards relevant to patent eligibility.

16. I understand that 35 U.S.C. § 101 defines the subject matter eligible for patent protection. Section 101 provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent thereof, subject to the conditions of this title."

17. I understand that a two-step framework distinguishes patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts. I understand that the inquiry is a question of law based on underlying facts.

18. I understand that in the first step, it must be determined whether the patent claims at issue are directed to a law of nature, natural phenomena, or an abstract idea.

19. I understand that if the claims are directed to an ineligible concept, then in the second step it must be determined, by considering whether the additional elements apart from the ineligible concept—individually or in combination—transform the nature of the claim into a patent-eligible application. I understand that this second step is a search for something different—an inventive concept—and also asks how the abstract idea is implemented. I understand that if the additional elements—individually or in combination—are not well-understood, routine and conventional to a skilled artisan in the relevant field, the claim is patent eligible. I understand that

whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact.

## IV. THE ’316 PATENT

20. I have reviewed the ’316 patent, which is titled “Integrated Shopping Within Long-Form Entertainment,” and is generally directed to technology related to interactive video layers within video media for users to engage with the video without disrupting the viewing experience. ’316 patent at Abstract; 4:8-25; 1:19-2:4.

21. For example, these interactive video layers are integrated into “long form entertainment” (e.g., movies) and include social media and/or shopping layers. ’316 patent at 2:8-21. In short, a user viewing a video media program is able to engage in commerce and/or interact with other users, all while the video media continues to play.

22. This technology streamlines a user’s experience by removing the need for multiple devices or screens when viewing video media, allowing nearly the entire experience to be consolidated into a single screen. Moreover, in multi-user examples (e.g., several viewers watching the same program in different locations), the technology of the ’316 patent allows for additional improvements to the ease of access for each user to the media content and to each other (e.g., via the social media layer). The “plug-in, non-invasive” nature of the invention described in the ’316 patent makes for seamless integration into any platform. ’316 patent at 4:21-25.

23. Thus, the techniques described in the ’316 patent improve upon prior technology through its unique integration of interactive layers.

### A. Claim 1

24. I have been asked to focus my analysis on claim 1 of the ’316 patent, but I address the remainder of the claims of the ’316 patent claims as well, to the extent they warrant discussion in relation to the issue of patent eligibility.

For reference, claim 1 is reproduced below:

> 1. A method for providing information on items, services, or songs in a video media comprising:
>
> a) receiving the video media having a plurality of visual or audio objects in one or

more frames of the video media;

b) processing the video media to generate a first interactive video layer, wherein the processing includes:

i. identifying one or more of the plurality of visual or audio objects within the video media,

ii. associating product information to the one or more of the plurality of visual or audio objects to correspondingly form one or more items, services, or songs of interest;

iii. tracking the one or more items, services, or songs of interest through the one or more frames of the video media; and

iv. assigning a selectable visual indicator for each of the one or more items, services, or songs of interest, wherein the first interactive video layer is configured to display the selectable visual indicator;

c) generating a video data comprising the video media, the first interactive video layer, and a second interactive video layer, wherein the video data is configured to be provided to a user via a first media playback device and to at least one guest via a second media playback device, wherein the second interactive video layer comprises a social media portion controllable by the user via the first media playback device, so as to interact with the at least one guest that is also a viewer of the video media through an interface displayed in the second interactive video layer via the second media playback device, wherein the second interactive video layer displays an interaction between the user and the at least one guest, and past interaction activity between a plurality of users in the social media portion, and wherein the user is capable of maintaining and toggling between a plurality of different conversations displayable in the social media portion in the second interactive video layer as an overlay to the video media displayed by the first media playback device, wherein the plurality of users either includes the user or does not include the user; and

d) distributing information associated with the one or more items, services, or songs in the video media to the user.

## V. BACKGROUND OF THE ART

### A. Growing Prevalence of Online Video Streaming

25. Beginning in the early 2000s, personal computing and "[t]he rapid expansion of office, home, and entertainment applications" led to new problems in user interface design and usability. "For these interfaces, ease of learning, low error rates, and subjective satisfaction are paramount because use is frequently discretionary and competition is fierce. If the users cannot succeed quickly, they will abandon the use of a computer or try a competing package. In cases where use is intermittent, clear, easy-to-remember procedures are important, and if retention is still faulty, comprehensible online help becomes important." Shneiderman at Section 1.4.3 (Usability Motivations).

26. Leading up to the mid-2010s, streaming online video media saw a great increase in popularity:




The Streaming Book, "A Quarter Century of Streaming Video" (Mar. 2023), [https://www.thestreamingbook.com/chapters/a-quarter-century-of-streaming-video/](https://www.thestreamingbook.com/chapters/a-quarter-century-of-streaming-video/).

27. With the increase in video media delivered through webpages on devices with smaller screens (e.g., laptop, tablet, smartphone), a specific technological problem arose as to how to provide information beyond just the video media to increase user engagement. For instance, information of interest to the user might be motivated by the content of the video itself, but the manner of delivering and supplementing that information to the user while maintaining immersion in the video media and providing calls to action was difficult. Because online video streaming was frequently accessed through a smaller screen with limited screen space, providing additional information to the user often required the user to navigate away from the video media. And, because online video streaming became more available to users, including with on-demand access, there was an increased likelihood of a user navigating away from the video media. *See* Garett at 2 ("Poorly designed websites may frustrate users and result in a high 'bounce rate'"). Thus, there was a need for a graphical user interface that married displaying the video media and information of interest to the user in a way that captured the user's attention and increased engagement with the video media without the user leaving the video media environment.

28. Additionally, there are significant differences between video media, which is dynamic, and static media such as printed publications and many websites of the time. Video media presents unique challenges to the design of user interfaces that keep users engaged with the video while presenting additional information and providing calls to action. For instance, video media presented with other information in the periphery or through multiple windows strains the user's information processing because degradation of information processing "is even greater" if the information presented "is dynamic or moving." Galitz at 69. It also can be difficult for users to return to a point in video from another screen while remembering the context of where they were and maintaining their engagement. Helping users regain that context in a video can be more difficult given the dynamic nature of a video as compared to a static website. To apply a more modern-day example, a major challenge for self-driving cars is helping drivers restore their context after they have not been paying attention to the road in order to pick up where the self-driving has left off – the so-called "handoff" problem. "many automotive technologists are skeptical that the so-called handoff from machine to human can be counted on, because of the challenge of quickly

bringing a distracted human back into control of a rapidly moving vehicle." NYTimes, "Robot Cars Can't Count on Us In An Emergency" (June 7, 2017), https://www.nytimes.com/2017/06/07/technology/google-self-driving-cars-handoff-problem.html. Due to the changes that occurred over the passage of time, returning the user to the right context is challenging. While returning a user to a playing video is clearly not as critical as a driver taking over control of a car, the same handoff problem still applies. We need interface designs that support the user being able to return to the original task while maintaining context.

29. Even considering printed publications in comparison to websites, there are unique challenges for websites available over the Internet tied to the particular medium. *See* Galitz at 28 ("Web interface design is also more difficult because the main issues concern information architecture and task flow, neither of which is easy to standardize."), 36-37 (discussing additional challenges specific to websites with respect to page size, page rendering, page layout, page resolution, user focus, and page navigation).

30. The '316 patent recognizes this very problem of needing to provide a graphical user interface that "align[ed] the interests of viewers, media companies, and advertisers into a seamless entertainment and marketing experience." '316 patent at 2:8-10.

**B. The State of The Art In 2016**

31. By 2016, there were a number of online streaming services that supported streaming video media to users. These included, for example, Netflix and Hulu, which were on-demand video streaming services that supported long-form content such as TV shows and movies, which were seen as a substitute to cable TV. In contrast, services such as Vimeo and YouTube allowed individual content creators to upload and share videos of varying length, which other users could watch. Still other services such as SnapChat and Instagram operated through a social media platform that supported streaming user-created videos that were typically shorter in length. *See* TechCrunch, "Instagram Launches 15-Second Video Sharing Feature, with 13 Filters And Editing" (June 20, 2013), https://techcrunch.com/2013/06/20/facebook-instagram-video/; TechCrunch, "Snapchat Releases Video Sharing, Is Prototyping Monetization Features" (Dec. 14, 2012), https://techcrunch.com/2012/12/14/snapchat-does-video/ (permitting 10-second videos to

be shared).

32. However, before December 2016, the manner in which additional information (such as through advertisements) or user engagement features (such as through user comments and chat) were presented to users were dissimilar to the invention of the ’316 patent.

33. For instance, one conventional way of providing additional information to a user, such as through advertisements, was through using a template-based display where the information would be shown in a static form adjacent to the video media. An example of this is shown below:




SetupAd Blog, “A Complete Guide to YouTube Ad Formats” (Jan. 12, 2023), https://setupad.com/blog/youtube-ad-formats-guide/ (annotations in original); Visible Factors, “An Introduction to Advertising on YouTube” (Aug. 13, 2021), https://visiblefactors.com/an-introduction-to-advertising-on-youtube/ (“In-Display Ads run on desktop and laptop computers. They appear on Youtube search result pages and video watch pages located to the right of the video you are viewing right above the list of video suggestions.”).

34. Such template-based displays were not related to the content of the video media the user was watching and were shown in a fixed location on the particular webpage, similar to traditional banner advertisements on websites. If the user wished to interact with the additional information, the user had to click on the portion of the screen outside of the video media to be brought to an external website that either directly replaced the window where the user was previously watching a video, or opened up a new window before the user.

35. Another conventional way of providing additional information to a user was

through overlays displayed on top of videos, which occluded a portion of the video media the user was watching. Similar to the template-based displays, if the user wished to interact with the additional information, the user had to click on the image to be brought to an external website that either directly replaced the window where the user was previously watching a video, or opened up a new window before the user.

36. For example, Hulu referred to these as "companion banners," which appeared while the video media is playing, and over the video media:

| Ad Format | Size | Length | Animation | Frame Rate |
|---|---|---|---|---|
| Companion Banners | 300 x 250 | Shows during ad play | Static, no animation on load. Animation allowed upon user-initiated rollover or click. No audio. | 30 fps |
| | 300 x 60, 234 x 60 | Shows during video content | Static, no animation on load. Animation allowed upon user-initiated rollover or click. No audio. | 30 fps |

Hulu, Ad Specs QuickSheet, https://assets.huluim.com/downloads/hulu_ad_specs_quicksheet.pdf.

37. As another example, YouTube also used this approach:




SetupAd Blog, "A Complete Guide to YouTube Ad Formats" (Jan. 12, 2023), https://setupad.com/blog/youtube-ad-formats-guide/ (noting that they "are effective for driving direct traffic to a website since they are present while a user is engaged with a video") (annotations in original); Medium, UX Collective, "The evolution of Youtube: How every platform evolves into an ad machine" (Nov. 12, 2025), https://uxdesign.cc/the-evolution-of-youtube-how-every-

platform-evolves-into-an-ad-machine-9e6032ff2d20 (referring to these as "InVideo advertisements" introduced in December 2007); Visible Factors, "An Introduction to Advertising on YouTube" (Aug. 13, 2021) https://visiblefactors.com/an-introduction-to-advertising-on-youtube/ ("You[T]ube ads were first introduced in 2007 with in-video overlay ads.").

38. In fact, Vimeo introduced an advertisement campaign in 2015 that poked fun at this approach as disruptive. Vimeo published a video that showed "a bunch of pop-ups" "infiltrating the screen" that intentionally blocked the subtitles during a critical moment between two characters "to illustrate that intrusive ads are just pesky distractions that ruin the overall user experience":






*See* AdBeat, "Inside Vimeo's $28M advertising strategy: How Youtube's artsy, ad-free, alternative is making a dent in the video-sharing landscape," https://blog.adbeat.com/inside-vimeos-28m-advertising-strategy-how-youtubes-artsy-ad-free-alternative-is-making-a-dent-in-the-video-sharing-landscape/; Vimeo, "VIMEO // Interrupted (Advertisements Suck)" (uploaded Jul. 28, 2015), https://vimeo.com/134776130?fl=pl&fe=cm.

39. For both the template-based displays or banners, the user typically was unable to engage with the advertisement affirmatively except for clicking on it, which would lead to the advertisement "linking out," or opening a new webpage separate from the instance displaying the video itself. From a user interface perspective, and in the context of online video streaming, both were not adapted to the specific qualities of video media compared to static websites. With online video streaming, such as through a computer screen or a mobile device screen, the real estate of the screen is limited. Using a display advertisement on part of the page minimized the already limited real estate and required the user to move away from the video media to see the additional information provided in the banner on a different portion of the webpage. Even if the user did not need to scroll away, displaying information separate from the video itself required redirection of focus from the video media. Likewise, while displaying banners over the video media did not

require the user to scroll or navigate away, the user had no ability to engage further with the information presented other than through navigating away from the video itself.

40. For popular video streaming services that provided content such as TV shows and movies, another conventional way of providing additional information of interest to a user was through short video clips that were designed like traditional commercials. These would appear either at the beginning, middle, or end of a TV show or movie (referred to as pre-roll, mid-roll, or post-roll, respectively). Like traditional commercials, these short clips interrupted the user from watching whatever video media was currently playing for the duration of the short clip.

41. For example, Hulu used this approach, referring to these as "in-stream video" advertisements:

**Standard Placements**

| Ad Format | Size | Length | Codec | Frame Rate |
|---|---|---|---|---|
| **High Def In-stream Video (pre, mid, post-rolls)** | 1440x1080 or higher (4:3 aspect ratio) or 1280x720 or higher (16:9 aspect ratio) *No black bars* | Normal Video Creative: :15s or :30s Extended Video Creative: <3 min or less | MPEG-2 Program Stream; No DivX, Sorenson, Cinepak or other lossy compression. | 29.97 fps Native frame rate preserved |
| **Standard In-stream Video (pre, mid, post-rolls)** | 540x404 or higher (4:3 aspect ratio) or 720 x 404 or higher (16:9 aspect ratio) *No black bars* | Normal Video Creative: :15s or :30s Extended Video Creative: <3 min or less | Any native Quicktime, AVID or Media 100 including MPEG-2, H.264; No DivX, Sorenson, Cinepak or other lossy compression. | 29.97 fps Native frame rate preserved |

Hulu, Ad Specs QuickSheet, https://assets.huluim.com/downloads/hulu_ad_specs_quicksheet.pdf; Chron, "How to Get the Short Advertisement on Hulu" (July 12, 2016), https://smallbusiness.chron.com/short-advertisement-hulu-30391.html ("To keep the majority of their content free Hulu shows advertisements during their streaming videos. If you are watching a longer video (20 minutes and up) you will usually be presented with two options for advertisements. The first option will be viewing a 2 to 3 minute-long ad at the beginning of the video and the other will be seeing several shorter 20 to 30 second advertisements spread throughout the video.").




Getting More Awesome, "Hulu Is Inventing The Future of TV Ads,"

https://www.gettingmoreawesome.com/2011/09/12/hulu-is-inventing-the-future-of-tv-ads/ (Sept. 12, 2011) (annotations in original).

42. YouTube introduced these as pre-rolls or mid-rolls starting in November 2008 through the beginning of 2009:




SetupAd Blog, "A Complete Guide to YouTube Ad Formats" (Jan. 12, 2023), https://setupad.com/blog/youtube-ad-formats-guide/ ("Some viewers can see these ads as intrusive or annoying, as they do not have the option to skip them") (annotations in original); Medium, UX Collective, "The evolution of Youtube: How every platform evolves into an ad machine" (Nov. 12, 2025), https://uxdesign.cc/the-evolution-of-youtube-how-every-platform-evolves-into-an-ad-machine-9e6032ff2d20.

43. Amazon, for Prime Video, also introduced pre-roll in order to keep up with other streaming services. Time, "Next Up on Amazon's Kill List: YouTube" (Feb. 21, 2014), https://time.com/9104/amazon-video-ads-could-threaten-youtube/ ("The world's largest online retailer has begun running preroll ads in front of some of the content on its Prime Instant Video streaming service.").

44. These in-stream video advertisements similarly disrupted the user's viewing experience of the video media. Either the pre-roll was ineffective for actual engagement (i.e., the

user would just skip it or ignore the information provided in efforts to get to the chosen video), or the mid-roll was seen as a nuisance preventing the user from continuing to watch the chosen video. In both cases, the in-stream video advertisements were divorced from the video itself, and forced the user out of the video media environment without giving the user a choice to continue watching and engagement with the video media. Further, certain in-stream video advertisements—just like TV advertisements—did not enable user interaction (contrary to how template-based displays or banners linked out to other websites).

45. Neither pre-rolls or mid-rolls offered a solution for providing information of interest to the user while playing video media in a way that increased user engagement and immersion with the video. Both were often seen as disruptive, which led to introduction of third-party "ad blockers" on video streaming platforms.

46. Typically, longer-format video streaming services did not offer further means of user engagement, such as through chat or conversations among users. For instance, Netflix and Hulu did not permit comments or reactions to the video media. For video streaming services that catered to user-created content, users were able to leave comments, but these were typically listed, independently one after the other, under the video itself. As discussed above, given the limited real estate available on a webpage, those comments independently displayed underneath a playing video on a webpage required the user to scroll away from the video media in order to read or leave a comment.

47. Turning to services that combined video with social media, the videos on these platforms were short-form that typically lasted on the order of less than a minute in length. These videos could be shown successively to the user on a feed. Because of the constraints of these short-form videos—the videos were already so short—any additional information provided to the user was presented between videos that the user was watching, similar to how a commercial break might occur between two 30-minute TV episodes.

48. For example, in 2015, Instagram introduced carousel advertisements, shown between content or videos that normally would appear on a user's feed. These carousel advertisements included a "Learn More" button "that house[d] these links" and "open[ed] a URL

in an internal browser within Instagram that allows you to quickly jump back to the feed with a tap of the top bar." TechCrunch, "Instagram Starts Letting Ads Be Clickable" (Mar. 4, 2015), https://techcrunch.com/2015/03/04/what-advertisers-want/ ("Instagram never allowed URLs to open until now").




Skift, "Instagram Brings Brands One Tap Closer To Customers With New Ad Product" (Mar. 5, 2015), https://skift.com/2015/03/05/instagram-brings-brands-one-tap-closer-to-customers-with-new-ad-product/ (showing mouse over the "Learn More" button). However, as the Skift article observed, "clicking through to a mobile branded site" "may still not be enough" as it required taking the user out of the context of the user's ordinary feed.

49. As another example, Snapchat followed suit by introducing "Snap Ads," which occurred between Snapchat "stories:" "Ads will appear occasional when users auto-advance at the end of one person's Stories to the next person." Net Imperative, "Shapchat finally opens up to third-party ads" (June 15, 2016), https://www.netimperative.com/2016/06/15/snapchat-finally-opens-third-party-ads/. For a user to engage with the additional information, the user was required to click into a link: "[Snap Ads] can be made to link through to one of the following media types or actions: Long-form video[;] App install[;] Article[;] Web view. Having this choice of click-through options gives the advertiser flexibility in terms of how their ads will convert." Target Internet, "A Practical Guide to Using Snapchat for Marketing" (Oct. 15, 2016),

https://targetinternet.com/resources/a-practical-guide-to-using-snapchat-for-marketing/.

50. In both examples, the user was transported away from the video media in order to follow a link to an external page.

**VI. PERSON OF ORDINARY SKILL IN THE ART ("POSITA")**

51. Counsel has informed me that patent claims are to be interpreted from the perspective of a POSITA, who is a hypothetical person in the relevant field who is presumed to have known the relevant art at the time of the invention. I understand that factors that may be considered in determining the level of ordinary skill in the art include the: (1) educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field.

52. In my analysis, I applied the following definition of a POSITA: A POSITA for the '316 patent at the time of invention would have had a bachelor's degree in the area of Electrical Engineering, Computer Engineering, Computer Science, or similar field, and two to three years of relevant experience in the area of multimedia systems including multi-user systems utilizing graphical user interfaces. The definition of level of skill in the art is not rigid; for example, more years of relevant experience may substitute for fewer years of education, and vice versa.

53. I have considered the level of skill in the art proposed by TikTok ("a bachelor's degree in the area of Electrical Engineering, Computer Engineering, Computer Science, or similar field, and at least two years of relevant experience in the area of multimedia systems including video processing and audio processing") as set forth in TikTok's claim construction briefing. Dkt. 66-1, Declaration of Dan Schonfeld ¶ 18. My analysis and opinions discussed in this Declaration would remain unchanged if I applied TikTok's proposed standard of a POSITA.

**VII. STEP ONE ANALYSIS**

54. I understand that TikTok contends that the '316 patent claims are directed to the abstract idea of "annotating video with product and social media information" and not to any technological improvement. TikTok's Motion at 1. I disagree. While I understand that Step One in the analysis is often a matter of law, the '316 patent's invention is directed to an improvement

in video streaming, specifically enhancing the computer video interface, not merely to an abstract idea, such as TikTok's purported abstract idea. *See* '316 patent at 2:11-13 ("interactive video layers [] are integrated into a form of entertainment and delivered to users as an online video streaming and advertising service"). The invention of the '316 patent solves the problem of the user being taken out of the video streaming environment during viewing. The specific user interface claimed includes structured, interactive video layers, including "a first interactive video layer" that is used for providing "product information" to "items, services, or songs of interest" to the user, and "a second interactive video layer" that is used for social media engagement among multiple different users. '316 patent at cl. 1. These layers are provided as "an overlay to the video media displayed" and are "integrate[d] within the entertainment without interruption of the entertainment and is immune to ad blocking." '316 patent at cl. 1, 2:13-18.

55. The specific characteristics of the respective interactive video media layers further distance the claimed invention from a mere abstract idea. For instance, the second interactive media layer allows users to interact with other users, and can be "maintain[ed] and toggl[ed] between … different conversations." '316 patent at cl. 1. Taken in combination with the rest of claim 1, this is not just an abstract idea that is automated with a computer. Rather, these layers, and how they function, capture a technological solution to the problem of presenting additional information of interest to the user without removing the user from the video media environment.

56. Especially relevant to media accessible through the Internet, the goal is to have a user respond to a "call to action," which refers to a prompt that encourages the audience to take a specific step. That step can range in various forms, including something as simple as clicking on a link, commenting on a video, or choosing to make a purchase. The claimed interactive video layers implement this without navigating the user away from the video media by allowing the user to take action through the interactive video layers. For instance, the first interactive video layer permits the user to "control their shopping experience without permanent interruption such as windows or prompts that other technology uses." '316 patent at 2:32-39. Similarly, the second interactive layer permits the user "to interact or talk with other users in a private form of communication on their personal device while watching a television show or movie." '316 patent

at 2:39-44. The video interface includes a call to action described as a "selectable video object [that] has a corresponding object function call defining an action to be performed responsive to user selection of the selectable video object." '316 patent at 15:50-52. Thus, the claimed invention of the '316 patent is directed toward solving a specific problem that is specific to the Internet as well as video media.

## VIII. STEP TWO ANALYSIS

57. Even if the '316 patent claims were directed to an abstract idea, such as TikTok's purported abstract idea, at step one of the analysis, the claims are nonetheless eligible at step two of the analysis because they add an inventive concept that is significantly more than the abstract idea. The additional claim elements—alone or in ordered combination—provide improved technology that is not well-understood, routine and conventional. The technological challenges associated with online video streaming are uniquely addressed by the claimed invention of the '316 patent. As discussed above, the use of interactive video layers displayed over the video media reflect the technological improvement that enables increased user engagement and interactivity, and increased immersivity.

58. These claimed interactive video layers, separately or in combination with the other elements, are not conventional or traditional. As the '316 patent specification explains, the claimed interactive video media layers are different from "traditional television guide layers, channel navigation layers, TV show or movie information layers, or closed captioning layers." '316 patent at 14:13-17. The '316 patent's claimed invention is unlike a "template display," which as otherwise been used for TV guide layers or channel navigation layers that had existed. For instance, these template display layers that existed before the '316 patent reflected information that was pre-populated and static in nature. The information provided by, for example, the TV guide was unlike any currently playing video media, and static in nature. In comparison, the claims of the '316 patent require specific processing of the video media, including the steps of identifying the "objects within the video media," and "tracking" the items of interest "through the one or more frames of the video media," and "assigning a selectable visual indicator" that "the first interactive video layer is configured to display." The '316 patent illustrates the dynamic processing of the

items of interests and display of the selectable visual indicators, such as in Figure 6 shown below:




*Fig. 6*

’316 patent at Fig. 6.

59. The user engagement offered the first interactive video layer (and through the selectable visual indicators for the items of interest displayed on the first interactive video layer), without navigating the user away from the video media, which provided a technological advancement beyond static template-based displays.

60. Likewise, the static template displays of the past did not include the social media aspects of the claimed second interactive video layer, which provided a means for users to interact with other users in real-time without navigating away from the video:




*Fig. 8*

’316 patent at Fig. 8.

61. For background, the static template-based displays of the past typically did not include overlays on top of the video media because there was no need to have those displays be tied intimately to the content of the video media shown. For example, a TV guide providing a timetable of upcoming shows was generated separate from the content of the video media shown. As shown in the screen captures of a user navigating a Comcast X1 Guide, flipping through the rows corresponding to different channels listed in the guide does not impact the currently playing video media, which is confined in the upper right portion of the screen’s layout:




YouTube, BWOne, “Comcast Xfinity X1 Box Review” (updated July 16, 2013), https://www.youtube.com/watch?v=BY7--Vv_eHc (at 6:11, showing selection of channel 835).




YouTube, BWOne, "Comcast Xfinity X1 Box Review" (updated July 16, 2013), https://www.youtube.com/watch?v=BY7--Vv_eHc (at 6:13, browsing to channel 836).




YouTube, BWOne, "Comcast Xfinity X1 Box Review" (updated July 16, 2013), https://www.youtube.com/watch?v=BY7--Vv_eHc (at 6:16, browsing to channel 837).

Conversely, neither the video media nor the content of the video media impacts what is displayed

in the guide. Even for electronic programming guides where browsing through different rows listed in the guide may automatically change the video playing in the upper right portion of the screen's layout, the video media and the content of the video media do not alter the display of information of interest (i.e., information provided through the guide) to the user.

62. In fact, the standard teachings regarding user interface deemphasized overlapping elements because such visual clutter in user interfaces often led to decreases in effectiveness and performance: "Clutter is the state in which excess items, or their representation or organization, lead to a degradation of performance at some task. Excess and/or disorganized display items can cause crowding (Stuart & Burian, 1962), masking (Legge & Foley, 1980), decreased object recognition performance due to occlusion, and impaired visual search performance (see Wolfe, 1998, for a review). More items can also stretch or exceed the limits of short-term memory (Miller, 1994)." Rosenholtz at 3.

63. However, through the "associating product information to the one or more of the plurality of visual or audio objects" and "tracking the one or more items, services, or songs of interest through the one or more frames of the video media" steps, the claimed invention of the '316 patent mitigates the burden of visual clutter on the user that would otherwise be caused by overlaid layers with multiple objects. Because the selectable visual indicators assigned to information of interest and displayed in the first interactive video layer are tied to the content of the video media (and "through the one or more frames of the video media"), the user is not so burdened since the first interactive video layer is not adding entirely new features. *See* Rosenholtz at 4-5 (discussing "feature congestion" as a measure of visual clutter), 7 ("the scene will appear less cluttered the more 'organized' it is," including through redundancies or predictability from the rest of the scene). At the same time, the claimed invention achieves an improvement—offering better interactive functionality—over the typical graphical user interfaces that separately displayed video media in a static template display containing other information divorced from the video media itself. In this sense as well, the technological improvement provided through the interactive video layers was unconventional.

64. The interactive video layers overlaid on top of the video media is germane to the

patented invention's improvement over what had existed in the art. At the time, there was no information (including anything that would have been of interest to the user) provided at all when ad blockers were used or the user was forced to experience disruptions to the user's experience of viewing video media. The latter approach was widely regarded as a significant drawback: "In hopes of gaining Web users' attention, disruptive ads are usually designed in such a way that they are pushed on their audiences (Xia & Sudharshan, 2002). Website viewers, with few alternatives, either have to pay attention to the uninvited message or take action to discontinue the disruptive ads (Dodd & Stevens, 2003). Nevertheless, with the advent of new media that prioritize personal choice and interactivity (Rust & Varki, 1996), the feeling of intrusiveness is supposed to abate. But to web users' disappointment, new technologies these days are craftier in delivering tailored marketing message to users and also they appear more relentless in reaching out to users who may feel annoyed. Moreover, consumers sometimes even cannot remove disruptive ads, and this forced exposure easily generates negative feeling toward online ads (Wang, Chen & Chang, 2008). The experience of forced exposure is regarded as most intrusive when website users are particularly goal oriented (Li et al., 2002)." Zha at 17-18.

65. Further, such "interruptions" "impede[d] people's ability to process information" (Zha at 16), and took the user's attention away whatever the user was viewing. This was particularly problematic for video media, which is dynamic in nature. Unlike any printed publication or webpage that might be disrupted by an advertisement and where the user is able to return to the source material, that is difficult with video media. Whatever frames of the video media had played would not be easily accessible post-disruption.

66. The invention of the '316 patent therefore provides a technological improvement over what was seen as a pitfall of advertising as applied to video media and the Internet. As the specification of the '316 patent explains, "ad blocking by a viewer can be avoided since the advertiser content is selected for the product information and then associated with the one or more of the plurality of objects to create new items of interest and blended into the video media for a specific user." '316 patent at 3:15-19. Similarly, "[t]he software, systems and methods disclosed do not utilize code blocks or JavaScript containing key words for advertisements, but rather are

associated with the items, services or songs [i.e., items of interest] within the video media." '316 patent at 23:34-38. In this manner, the patented invention provides an innovative middle ground where the user can still receive information regarding items of interest in a less disruptive way, without being taken to a different online environment.

67. Additionally, overlaying interactive video layers on top of the video media provided a technological improvement especially beneficial to small-screen devices, which became more prevalent in the late 2000s and early 2010s. For these Internet-connected portable devices on which users accessed Internet webpages and streamed video, the size of the display screens were limited: "As users pan and zoom, display content can disappear into off-screen space, particularly on small-screen devices." Baudisch at 481. "The smaller the screen, the more temporal the interface becomes … Small devices can only present part of the information at a time." Shneiderman at Section 7.8.2 (Menus for Small Displays). Thus, graphical user interfaces needed to integrate techniques that dealt with this specific technological constraint: "Mobile computing applications rely on small devices users can carry with them. These devices have small screens (perhaps 120 x 160 pixels) that make most desktop screen designs impractical. They require a radical rethinking of what functionalities should be included and often lead to novel interface and menu designs specially adapted to the device and the application (Bergman, 2000; Weiss, 2002; Lindholm and Keinonen, 2003)." Shneiderman at Section 7.8 ("Audio Menus and Menus for Small Displays"); *see also* Shneiderman at Section 9.5.4 (Mobile Device Displays) ("Some applications, such as web searching and browsing, remain very ineffective on small displays (Jones, Buchanan, and Thimbledy, 2003). Custom redesigns are preferable but not always feasible."). While the phones from the early 2000s had more technical restrictions, the issues for small-device user interface design still apply.

68. For example, in a particular application for personal navigation devices, "requir[ing] users to zoom in and out repeatedly" was "a time-consuming process that can hardly be accomplished on-the-fly" because "relevant locations disappear into off-screen space." Baudisch at 481. Likewise, for the display of video media on such small-screen devices, requiring users to pan around or navigate away from the video media too was impractical since doing so

would break the users' attention on the video media—either because the video media would continue to play while the user was unable to engage with the video media, or because the user was directed away from the video media altogether. And, even a side-by-side display, or larger screen size, would not remedy the problem of breaking the user's attention on the video media, especially since the video media can continue to advance while the user's head and eyes are drawn to focus elsewhere. *See* Galitz at 227 ("A large display area will require longer control movements to reach all locations on the screen, and more head and eye movements."). The '316 patent distinguishes its invention from alternatives that are like template-based displays. '316 patent at 14:13-17. The interactive video layers allowed users to remain in the video media environment while carrying on other activities such as exploring items of interests through the first interactive media layer or interacting with different users through the second interactive media layer.

69. The interactive video layers of the '316 patent provided a technological improvement consistent with the "golden rules of interface design"—specifically, reducing short-term memory load. *See* Shneiderman at Section 2.3.4 ("Use The Eight Golden Rules of Interface Design") (recommending "that displays be "kept simple, multiple-page displays be consolidated, window-motion frequency be reduced, and sufficient training time be allotted for codes, mnemonics, and sequences of actions"); *see also* Shneiderman at Section 7.8.2 (Menus for Small Displays) ("Mobile device designers also need to allow users to deal with interruptions and distractions in their environment."). Applied to video media, reducing short-term memory load is easier said than done. In other words, simply showing the user more information consolidated onto one screen runs the risk of overloading the user with visual clutter; as noted above, more items shown to the user typically burdens short-term memory. By providing the claimed interactive video layers, and in a manner that associates the tracked items of interest of the video media and the displayed visual indicators for those items through the first interactive video layer, the claimed '316 patent offer a technological improvement that strikes the right balance.

70. Similarly, other dependent claims build on the same technological improvement. For example, claims 2-5 recite the ability of the user to turn on and off, or otherwise control, the first interactive video layer. As another example, claims 9-11 recite a third interactive video layer,

including where the third interactive video layer provides "a side room" or additional information such as a "promotional video, a game, and/or merchandise." *See, e.g.*, '316 patent cls. 9-11, 2:19-21 ("Another interactive video layer includes interactive side rooms in which users can experience a deeper immersion of the television show or movie experience."). These dependent claims also reflect increasing user engagement and maintaining immersivity with respect to the underlying video media through the interactive video layers. For instance, the user's control over when the first interactive video layer is displayed is a technological solution that is a middle ground between a mere template display that distracts the user's focus from the video media, and a persistent overlay that may lead to visual clutter and counteract the benefits of providing additional information about the items of interest to the user.

71. Finally, I understand that TikTok contends that the invention of the '316 patent is conventional because the specification only references purportedly conventional design tools and software to implement the claimed invention. *See* TikTok's Motion at 16. I disagree. TikTok overlooks the context of the '316 patent and the state of the art at the time of the invention. The '316 patent's discussion of various platforms and devices merely confirms that the '316 patent's inventive technology can be agnostic to an underlying system: the "interactive layers are a plug-in, non-invasive feature that can be added to any media site." This is consistent with the teachings regarding user interface. Discourse on user interface design recommends interoperability and compatibility of graphical user interfaces with underlying systems, especially for the non-desktop platforms that grew in popularity in the 2000s. For example: "The bad news-at least from the designer's point of view-is that there has been a rapid and remarkable proliferation of non-desktop platforms in recent years. These include mobile devices, cell phones, Tablet PCs, programmable appliances, and set-top boxes for televisions offering cable TV and Internet access. Since these new platforms come with extensive design environments, interfaces must be built using low-level tools." Shneiderman at Section 5.3 (Interface-Building Tools) (further emphasizing "user-interface independence," which refers to "the decoupling of the user-interface design from the complexities of programming"); *see also* Garett at 9 ("Website designers and researchers must be mindful of different platforms and browsers to minimize the risk of losing users due to

compatibility issues.”).

***

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and recollection.

Executed this May 8, 2026, in Windsor, MA.

By: ______________________

Benjamin B. Bederson, Ph.D.